No. 4:26-cv-01010

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re: LOYALTY VENTURES INC., *et al.*,

*Debtors*,

BREAD FINANCIAL HOLDINGS, INC. f/k/a Alliance Data Systems
Corporation, in its own name and as successor-in-interest to Alliance Data
International LLC, Alliance Data Foreign Holdings LLC, and ADS Foreign
Holdings, LLC; and JOSEPH L. MOTES III,

*Defendants-Appellants*,

v.

PIRINATE CONSULTING GROUP, LLC, AS TRUSTEE OF THE
LOYALTY VENTURES LIQUIDATING TRUST,

*Plaintiff-Appellee*.

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas Houston Division
Adv. Pro. No. 24-03027, Christopher M. Lopez, Bankruptcy Judge Presiding

## APPELLANTS' OPENING BRIEF

Eric D. Wade
John F. Higgins
Megan Young-John
James A. Keefe
ewade@porterhedges.com
jhiggins@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com
PORTER HEDGES LLP
1000 Main Street, Suite 3600
Houston, Texas  77002
Telephone: 713-226-6000

Benjamin S. Kaminetzky (*pro hac vice*)
James I. McClammy (*pro hac vice*)
Joshua Y. Sturm (*pro hac vice*)
Tina Hwa Joe (*pro hac vice*)
ben.kaminetzky@davispolk.com
james.mcclammy@davispolk.com
joshua.sturm@davispolk.com
tina.joe@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: 212-450-4000

**COUNSEL FOR APPELLANTS**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant Bread Financial Holdings, Inc. states that it is a publicly held corporation and has no parent corporation. Based on available information, The Vanguard Group, Inc. and BlackRock, Inc. each beneficially own 10% or more of the outstanding common stock of Bread Financial Holdings, Inc.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF ISSUES PRESENTED.......................................................2

PRELIMINARY STATEMENT ..................................................................... 2

STATEMENT OF THE CASE....................................................................... 5

    I.      Factual Background.........................................................................5

    II.    Procedural History.........................................................................10

SUMMARY OF ARGUMENT ..................................................................... 13

ARGUMENT .............................................................................................. 14

    I.      The Bankruptcy Court Erred in Its Interpretation of Section
           546(e) of the Bankruptcy Code ...........................................................14

         A.      The *Greektown* standard reflects the plain meaning of
                 "for the benefit of" and comports with the meaning of
                 that phrase in a neighboring Code section. ...............................16

         B.      The *Greektown* standard faithfully applies the Supreme
                 Court's guidance in *Merit Management*. ..................................17

         C.      The *Greektown* standard strikes an appropriate balance
                 between competing legislative objectives................................19

         D.      The Bankruptcy Court's reasons for rejecting *Greektown*
                 are not compelling...................................................................20

    II.    The Bankruptcy Court Erred in Finding an Issue of Fact Where
          the Trustee Failed to Rebut with Probative Evidence........................22

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Greektown Litig. Tr. v. Papas (In re Greektown Holdings, LLC)*,
  621 B.R. 797 (Bankr. E.D. Mich. 2020) ..................................................... *passim*

*In re Crocker*,
  941 F.3d 206 (5th Cir. 2019) ............................................................................. 2

*In re Porter Dev. Partners, LLC*,
  2024 WL 1549689 (Bankr. S.D. Tex. Apr. 9, 2024) ......................................... 24

*In re QSI Holdings, Inc.*,
  571 F.3d 545 (6th Cir. 2009) ........................................................................... 18

*In re Reserve Prod., Inc.*,
  190 B.R. 287 (E.D. Tex. 1995) .......................................................................... 1

*In re Trib. Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019) .............................................................................. 19

*Laughlin v. Olszewski*,
  102 F.3d 190 (5th Cir. 1996) ....................................................................... 5, 25

*Mack v. Newton*,
  737 F.2d 1343 (5th Cir. 1984) ......................................................................... 15

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  583 U.S. 366 (2018) .................................................................................. *passim*

*Reily v. Kapila (In re Int'l Mgmt. Assoc.)*,
  399 F.3d 1288 (11th Cir. 2005) ....................................................................... 15

*Senior Transeastern Lender Banks v. Off. Comm. of Unsecured Creditors (In re TOUSA, Inc.)*,
  680 F.3d 1298 (11th Cir. 2012) ................................................................... 16, 17

*Southstar Holdings, LLC v. Crest Energy Partners GP (In re Crescent Trading LLC)*,
  654 B.R. 246 (Bankr. S.D. Tex. 2023) ...................................................... 5, 14, 25

STATUTES & RULES

28 U.S.C. § 157 ..................................................................................... 1

28 U.S.C. § 158(a)(3) ........................................................................... 1

28 U.S.C. § 1334 .................................................................................. 1

11 U.S.C. § 546 ............................................................................ *passim*

OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) ...............................................16

5 Collier on Bankruptcy (16th ed. 2024) ..............................................16

## JURISDICTIONAL STATEMENT

On February 5, 2026, Defendants-Appellants Bread Financial Holdings, Inc., formerly known as Alliance Data Systems Corporation ("ADS"), in its own name and as successor-in-interest to Alliance Data International LLC, Alliance Data Foreign Holdings LLC, and ADS Foreign Holdings, LLC, and Joseph L. Motes III (together, "Defendants") moved for leave to appeal (APPEAL_000901-915 ("MLA")) the Bankruptcy Court's January 22, 2026 Order Denying Partial Summary Judgment (APPEAL_000869-881 (the "Order")).[1] On February 26, 2026, this Court ordered the parties to confer and provide joint notice of a briefing schedule for this appeal.  (Dkt. 6.)  This Court has jurisdiction over the appeal of the Order under 28 U.S.C. § 158(a)(3), which grants district courts the jurisdiction to hear appeals from interlocutory orders in bankruptcy proceedings "involv[ing] a controlling question of law as to which there is substantial ground for difference of opinion [for which] an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]"  *In re Reserve Prod., Inc.*, 190 B.R. 287, 289 (E.D. Tex. 1995).  The bankruptcy court has jurisdiction over the adversary proceeding under 28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

---

[1] All references to the record "APPEAL_[page no.]" are to the pagination as set forth in Dkt. 8.

1

## STATEMENT OF ISSUES PRESENTED

1.    What is the standard for a transfer to be shielded from certain bankruptcy avoidance actions because it was "for the benefit of" a non-transferee covered entity under section 546(e) ("Section 546(e)") of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code")?

2.    Did the Bankruptcy Court err in denying summary judgment and holding that there existed a genuine issue of material fact, where the non-movant failed to provide any rebuttal evidence on the alleged issue of fact?

"[D]enials of summary judgment [are reviewed] *de novo*.    Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *In re Crocker*, 941 F.3d 206, 210 (5th Cir. 2019).

## PRELIMINARY STATEMENT

The main question on appeal is the meaning of the phrase "for the benefit of" in Section 546(e) of the Bankruptcy Code.  This Court should give those words their plain English meaning and apply the same stringent standard used in the only reported ruling on this issue: a transfer is made "for the benefit of" a covered financial institution that was not a direct defendant transferee if that entity "received a direct, ascertainable, and quantifiable benefit corresponding in value to the

2

payments to Defendants." *Greektown Litig. Trust v. Papas (In re Greektown Holdings, LLC)*, 621 B.R. 797, 822 (Bankr. E.D. Mich. 2020).

In the below Adversary Proceeding, Plaintiff-Appellee Pirinate Consulting Group, LLC, as Trustee of the Loyalty Ventures Liquidating Trust (the "Trustee" or "Plaintiff") seeks to avoid transfers of $750 million and other consideration paid to Defendant ADS to consummate a spinoff (the "Spinoff").  Section 546(e) provides that those transfers are safe harbored from federal constructive fraudulent transfer claims, state law fraudulent transfer claims, and foreign law fraudulent transfer claims if those transfers were "for the benefit of" financial institutions like ADS's prepetition secured lenders (the "Lender Banks").  Therefore, Defendants' motion for partial summary judgment (the "Motion") argued that twenty of the twenty-seven claims should be dismissed because the transfers at issue were made "for the benefit of" the Lender Banks based on two undisputed facts: (1) the full $750 million amount transferred from LVI to ADS was immediately transferred to the Lender Banks and (2) ADS was contractually obligated to transfer to the Lender Banks the full $750 million in received in the Spinoff.

That first fact alone—that that the Lender Banks received the same $750 million paid to ADS—satisfies the narrow *Greektown* test because the Lender Banks received a benefit that was direct, ascertainable, and quantifiable and that benefit corresponded exactly in value to the challenged payments to Defendants.  It is even

3

clearer in this case that the disputed transfers met the standard because the Lender Banks bargained for the contractual entitlement to receive those Spinoff proceeds.

The Trustee did not dispute either that the full amount of the transfers immediately went to the Lender Banks or that the ADS Credit Agreement required the transfers to be passed immediately to ADS's lenders. Instead, the Trustee appeared to argue that Section 546(e) cannot apply because the Separation and Distribution Agreement (including the appendix "Restructuring Plan," the "SDA") that implemented the key Spinoff transactions was unclear as to exactly which lenders were contractually entitled to receive debt repayments: the Lender Banks to whom the $750 million was paid under the ADS Credit Agreement or some other unspecified ADS lenders that may or may not have been financial institutions.

This red herring argument leads to the second issue on appeal because (i) the Trustee did not submit any rebuttal evidence to support its argument that the lenders referenced in the SDA could plausibly mean any lenders other than the Lender Banks and (ii) the Trustee has since conceded that there is no disputed question of fact about the identity of the lenders referenced in the SDA. Nevertheless, the Bankruptcy Court held that "there is a genuine issue of material fact over whether the SDA mandated payment to non-contract parties like [the Lender Banks]" and "whether [the Lender Banks] must be the third parties or ADS Eligible Creditors referenced in the Restructuring Plan."

4

The Bankruptcy Court made this holding even though the Trustee failed to submit any evidence on this supposed "issue of fact" in response to Defendants' evidence, and even though nothing in the record supported an inference that any entities other than the Lender Banks were the lenders referenced in the contracts. That holding was also error, as it was contrary to the standard in this Circuit that "[f]actual controversies are resolved in favor of the nonmovant 'only when there is an actual controversy—that is, when *both* parties have submitted evidence of contradictory facts.'" *Southstar Holdings, LLC v. Crest Energy Partners GP (In re Crescent Trading LLC)*, 654 B.R. 246, 252 (Bankr. S.D. Tex. 2023) (emphasis added) (quoting *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996)).

Accordingly, Defendants respectfully request that this Court reverse and grant Defendants partial summary judgment on the twenty claims that are subject to Section 546(e) or, in the alternative, that this Court reverse and remand for further proceedings.

## STATEMENT OF THE CASE

### I.    Factual Background[2]

In November 2021, Defendant ADS spun off Loyalty Ventures Inc. ("LVI"), which would eventually become the debtor in the underlying bankruptcy case. LVI

---

[2] Defendants focus herein on the factual allegations that are relevant to this narrow appeal. However, should the Court wish to review a longer recitation of the factual
(….continued)

5

included two main business segments, the Air Miles Reward Program ("AMRP")

and BrandLoyalty, which operated various loyalty programs for airlines, grocers,

and other retailers.  (APPEAL_000992, APPEAL_001005.)

To effect the Spinoff, LVI paid $750 million to an ADS subsidiary, Alliance

Data International LLC ("ADILC") in exchange for all outstanding stock of the

LoyaltyOne business. As the Trustee alleged, that amount was, pursuant to a

Distribution Agreement, "all to be distributed up the corporate chain [to ADS] and

used to pay down ADS's outstanding debt."  (APPEAL_001069.)  $650 million of

the funds came from a loan (the "LVI Loan") under a credit agreement (the "LVI

Credit Agreement"), and $100 million in cash came from Rhombus Investments

L.P., a LoyaltyOne operating subsidiary, which transferred the funds to ADI Crown

Helix Limited, from where it was distributed to ADILC.  (APPEAL_001069;

APPEAL_001074.)

The Spinoff was implemented through several contractual agreements, the

relevant ones of which are described below.

*First*, the Spinoff could not occur until the ADS Credit Agreement was

amended to permit the transfer of LVI's assets, which served as collateral credit

---

allegations relating to the underlying claims, Defendants respectfully refer to the
Court to the background section of Defendants' Motion to Dismiss
(APPEAL_000011-26).

support for the ADS Credit Agreement Loan.  Therefore, in advance of the Spinoff, ADS and its lenders agreed to amend the ADS Credit Agreement to permit ADS to transfer the LVI assets and make other amendments necessary to conduct the Spinoff.[3]  In exchange for these modifications, ADS contractually obligated itself to use all the Spinoff proceeds to pay down the ADS Credit Agreement: it committed to "make mandatory principal prepayments of the Term Loans in amounts equal to 100% of the aggregate Net Cash Proceeds from . . . each LoyaltyOne Divestiture [(i.e., the Spinoff)]," minus $25 million.  (APPEAL_001741; *see also* APPEAL_001762 (conditioning permission for the LoyaltyOne Divestiture on Section 2.11(d)).

*Second*, on November 3, 2021, ADS and LVI entered into the SDA (APPEAL_001069).  In the SDA, in exchange for all assets and liabilities of the LoyaltyOne business segment, LVI agreed to distribute 81% of LVI's stock to ADS's shareholders; ADS would retain the remaining 19% of LVI's shares. (APPEAL_001071.)  Additionally, the SDA spelled out what ADS was required to

---

[3] For example, the Seventh Amendment to the ADS Credit Agreement added an exception to the preexisting restrictions on ADS and its subsidiaries from transferring any substantial part of their assets, in order to permit them to "complete any Spinco Formation Transfers" and the "LoyaltyOne Divestiture." (APPEAL_001761-62.)  ADS's lenders obtained protection that, if the Spinoff were "no longer contemplated or anticipated to occur," ADS would "cause Spinco to become an Elective Guarantor within 30 days of such determination." (APPEAL_001772.)

do with the $750 million in Spinoff proceeds it would receive. Specifically, the SDA required that ADS "us[e] the Cash Proceeds [i.e., the $650 million debt proceeds[4]] *to repay or repurchase certain of its debt from third-party lenders*," and "use cash proceeds it receives in Step 5 of the Restructuring Plan [i.e., the $100 million in cash[5]] *to repay or repurchase certain of its debt from third-party lenders*." (APPEAL_001202 (emphases added).)

On November 5, 2021, ADS distributed 81% of the LVI shares to ADS stockholders, retained the remaining 19% shares, and received $750,000,000. (APPEAL_001071.) On the following business day, ADS paid Wells Fargo, in its capacity as the administrative agent under the ADS Credit Agreement, $750,000,000. (APPEAL_000498-99 (showing wires to Wells Fargo Bank N.A. for $724,640,000 and $25,360,000, totaling $750,000,000.)) On the same day, Wells Fargo transferred $750,000,000 to the Lender Banks—which are listed in the Seventh Amendment to the ADS Credit Agreement (APPEAL_001808-09)—less $45,384,800.34 that Wells Fargo kept for itself in its capacity as a lender. Table 1 below shows the amounts transferred to each of the Lender Banks.

---

[4] "Cash Proceeds" was defined as "certain proceeds of the Loyalty Ventures Financing Arrangements." (APPEAL_001180.)

[5] Step 5 of the Restructuring Plan was: "Lux Holdings and/or ADICH distributes approximately $100 million of cash up the chain to ADS. ADS uses the approximately $100 million of cash to pay down a portion of its third-party debt." (APPEAL_001358.)

## Table 1

| Bank | Amount | Record Page |
|---|---|---|
| Associated Bank, N.A. | $14,232,551.26 | APPEAL_000505 |
| Bank of America, N.A. | $45,384,800.36 | APPEAL_000507 |
| The Bank of Nova Scotia | $45,384,800.36 | APPEAL_000509 |
| BNP Paribas | $37,178,383.40 | APPEAL_000511 |
| Cadence Bank, N.A. (n/k/a Cadence Bank) | $8,586,698.18 | APPEAL_000513 |
| Canadian Imperial Bank of Commerce, New York | $45,384,800.36 | APPEAL_000517 |
| Chang Hwa Commercial Bank, Ltd., Los Angeles Branch | $1,506,957.07 | APPEAL_000515 |
| Citizens Bank, N.A. | $45,384,800.36 | APPEAL_000519 |
| Fifth Third Bank, National Association | $44,417,798.70 | APPEAL_000521 |
| First Hawaiian Bank | $10,407,712.53 | APPEAL_000523 |
| First National Bank of Omaha | $2,428,059.43 | APPEAL_000525 |
| Hua Nan Commercial Bank Ltd., Los Angeles | $1,506,957.07 | APPEAL_000527 |
| The Huntington National Bank | $9,492,353.23 | APPEAL_000529 |
| JPMorgan Chase Bank, N.A. | $45,384,800.36 | APPEAL_000531 |
| KeyBank National Association | $45,384,800.36 | APPEAL_000533 |
| Mizuho Bank, Ltd. | $40,342,501.13 | APPEAL_000535 |
| MUFG Bank, Ltd. (f/k/a The Bank of Tokyo Mitsubishi) | $45,384,800.36 | APPEAL_000553 |
| The Northern Trust Company | $22,326,219.10 | APPEAL_000537 |
| Raymond James Bank | $11,231,111.78 | APPEAL_000539 |
| Regions Bank | $34,346,792.69 | APPEAL_000543 |
| Royal Bank of Canada | $42,515,828.20 | APPEAL_000541 |
| Synovus Bank | $7,487,407.88 | APPEAL_000547 |
| Taiwan Business Bank, Ltd., New York Branch | $2,009,276.10 | APPEAL_000549 |
| Texas Capital Bank, N.A. (n/k/a Texas Capital Bank) | $17,173,396.34 | APPEAL_000551 |
| Truist Bank (f/k/a SunTrust Bank) | $45,384,800.36 | APPEAL_000545 |
| U.S. Bank National Association | $34,346,792.69 | APPEAL_000555 |
| *Wells Fargo Bank, National Association* | *$45,384,800.34* | *N/A* |
| | | |
| **Total** | **$750,000,000.00** | |

9

After the Spinoff, unforeseen business challenges and changing economic conditions led to financial difficulties for LVI.  The First Day Declaration filed in connection with LVI's bankruptcy explained the devastating effect of the Ukraine war and supply chain issues on LVI's business.[6]  On March 10, 2023, LVI and three affiliated entities filed for Chapter 11 bankruptcy protection in the Bankruptcy Court in the Southern District of Texas.  (APPEAL_001080.)

## II.    Procedural History

In the Bankruptcy Court below, Defendants argued on a motion to dismiss that, *inter alia*, twenty of the Trustee's twenty-seven claims—that is, the federal constructive fraudulent transfer claims, state law fraudulent transfer claims, and foreign law fraudulent transfer claims—should be dismissed because the transfers met the statutory requirements of 11 U.S.C. § 546(e), which safe harbors transfers that were made (1) in connection with a securities contract and (2) "for the benefit of" financial institutions.  (APPEAL_000218-23.)  Only the second prong, "for the benefit of," was in dispute.

The Bankruptcy Court did not issue an opinion on the motion to dismiss. Instead, at a June 10, 2025 status conference, the Bankruptcy Court ordered that the portion of Defendants' motion to dismiss relating to Section 546(e) be converted

---

[6] Declaration of Charles Horn In Support of Chapter 11 Petitions and First Day Motions, *In re Loyalty Ventures, Inc., et al.*, Ch. 11 Case No. 23-90111 (CML) (Jointly Administered) (Bankr. S.D. Tex.) Doc. 13 ¶¶ 50–54.

10

into a motion for partial summary judgment, and that Defendants re-file their arguments and evidence accordingly.  Because the motion for partial summary judgment would be filed prior to the discovery stage, the Bankruptcy Court instructed the Defendants to "get something on file in 30 days, . . . and then maybe [the Trustee] can ask for some discovery" related to the Section 546(e) arguments "before [the Trustee] respond[s]."  (APPEAL_000954.)  The Bankruptcy Court instructed the parties to raise with the Court any disputes on such discovery, where "someone [will] show[] up with a list of document requests, . . . and people will live with the decision that I make on docs." (*Id.*)  The Trustee's counsel agreed, saying, "[W]e're going to now see what the motion is with the evidence, and then we're going to have an ability to say what discovery we need."  (APPEAL_000962.)

Defendants filed their Motion, arguing that "[u]nder Section 546(e), a transfer is 'for the benefit of' an entity that was not the defendant transferee but nonetheless 'received a direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants.'" (APPEAL_000482-83 (quoting *Greektown*, 621 B.R. at 822).)  Defendants argued that that standard was easily met here, because Defendant ADS was contractually obligated to, and indisputably did, immediately use the $750 million in Spinoff proceeds it received to make corresponding payment to the Lender Banks, undisputed financial institutions—and the Lender Banks thus "received a direct, ascertainable, and quantifiable benefit corresponding in value to

11

the payments to Defendants."   In support, Defendants submitted wire records showing the transfers of $750 million to Wells Fargo, the administrative agent on the ADS Credit Agreement, and then Wells Fargo's distribution of the $750 million to the Lender Banks (APPEAL_000498-99; APPEAL_000505-55); the SDA, which required ADS to use all of the Spinoff proceeds to pay off "certain of its debt from third-party lenders" (APPEAL_001176-642); and the ADS Credit Agreement, which required ADS to use all of the Spinoff proceeds to pay the Lender Banks (APPEAL_001644-90).

After Defendants filed their Motion, the Trustee did not propound any related discovery requests.  Instead, the Trustee filed its opposition brief 30 days later.

The Bankruptcy Court then denied the Motion, making two holdings.  Taking those in reverse order, first, the Bankruptcy Court, in a footnote, "reject[ed] Defendants' efforts to use the expansive definition used in [*Greektown*] to include Defendants as transferees.  Defendants appear to seek treatment as initial transferees, and they may be after a trial.  But they also may be subsequent transferees for purposes of a recovery under § 550." (APPEAL_000880 n.63.)

Second, in response to Defendants' argument that ADS was contractually obligated to, and did, immediately use the $750 million to pay the Lender Banks, the Bankruptcy Court held that "there is a genuine issue of material fact over whether the SDA mandated payment to non-contract parties like Wells Fargo and the Term

Loan Lenders. There is also a dispute over whether Wells Fargo and the Term Loan Lenders must be the third-parties or ADS Eligible Creditors referenced in the Restructuring Plan. Defendants claim the ADS Credit Agreement required ADS to pay Spinoff proceeds to Wells Fargo and the ADS Term Loan Lenders. This only highlights that there are disputed material facts between the parties. Summary judgment is denied for these reasons alone." (APPEAL_000879.)

The Bankruptcy Court relied on both erroneous holdings to deny partial summary judgment.

## SUMMARY OF ARGUMENT

The Bankruptcy Court erred in denying Defendants' motion for partial summary judgment. *First*, the Bankruptcy Court erred in rejecting Defendants' plain language and common-sense definition—supported by case law—that under Section 546(e) a transfer was made "for the benefit of" an entity if the entity received a "direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants." *Greektown*, 621 B.R. at 822. *Greektown* is the only case law interpretation on the language "for the benefit of" in Section 546(e), and it accords with the legislative goals of Section 546(e), the Supreme Court case *Merit Management Group, LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018), and other case law interpreting the meaning of "benefit" in Section 550 of the Code.

13

*Second*, the Bankruptcy Court erred in holding that "there is a genuine issue of material fact over whether the SDA mandated payment to non-contract parties like [the Lender Banks]," and "whether [the Lender Banks] must be the third-parties or ADS Eligible Creditors referenced in the Restructuring Plan." (APPEAL_000879.)  The standard in this Circuit is that "[f]actual controversies are resolved in favor of the nonmovant 'only when there is an actual controversy—that is, when *both* parties have submitted evidence of contradictory facts.'"  *Southstar Holdings*, 654 B.R. at 252 (emphasis added).  Here, the Trustee relinquished its opportunity to take any discovery on this "issue of fact," and nothing in the record supported an inference that any entities other than the Lender Banks could possibly be entities referenced in the SDA.  The Trustee has also since conceded that there is no issue of fact that the Lender Banks were the entities referenced in the SDA, warranting reversal.

## **ARGUMENT**

### I.    **The Bankruptcy Court Erred in Its Interpretation of Section 546(e) of the Bankruptcy Code**

Section 546(e) provides in relevant part:

> Notwithstanding sections 544 [and] 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer . . . made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract, as defined in section 741(7).

14

In other words, a transfer is protected under the safe harbor if it is (1) "made 'in connection with a securities contract'" and (2) "was 'made by or to (or for the benefit of)' a [financial institution] covered entity." *Merit Management*, 583 U.S. at 380, 384 (quoting 11 U.S.C. § 546(e).).

The Trustee has conceded that the challenged transfer met the first prong. Therefore, the only disputed legal issue is the standard for satisfying the second "for the benefit of" prong.

*Greektown* is the only case supplying a proposed standard, and the Bankruptcy Court did not suggest any alternative. Under *Greektown*, a transfer was made "for the benefit of" an entity if the entity received a "direct, ascertainable, and quantifiable benefit corresponding in value to the payments to Defendants." *Id.* at 822 (relying on *Reily v. Kapila (In re Int'l Mgmt. Assoc.)*, 399 F.3d 1288, 1289 (11th Cir. 2005), and *Mack v. Newton*, 737 F.2d 1343, 1359–60 (5th Cir. 1984)). This standard accords with the plain meaning of Section 546(e), the meaning of the phrase "for the benefit of" in a neighboring Code section, and the *Merit Management* Supreme Court decision. It also strikes an appropriate balance between the competing goals of constructive fraudulent transfer claims and Section 546(e)'s securities safe harbor. Accordingly, the *Greektown* standard (and the statute's plain language) should apply here.

15

A.    The *Greektown* standard reflects the plain meaning of "for the benefit of" and comports with the meaning of that phrase in a neighboring Code section.

The standard articulated in *Greektown* is grounded in the plain meaning of "benefit," which includes "advantage" or "gain."  Benefit, Black's Law Dictionary (12th ed. 2024.).  It also aligns with cases interpreting the meaning of "benefit" in the neighboring section 550 of the Bankruptcy Code; Collier on Bankruptcy notes the following examples of entities for whose benefit a transfer is made under that section:

- In a "transfer of a lien," "the transferee of the proceeds of the loan secured by that lien where the loan documents require the payment to that transferee entity";

- A "third party who is paid by a purchaser of the debtor's assets when the purchaser assumes the liability to the third party in connection with the purchase of debtor's assets"; or

- An "undersecured junior creditor who is benefitted by the debtor's payment of the debt secured by the senior lien."

5 Collier on Bankruptcy ¶ 550.02[4] (16th ed. 2024).

The first example above describes *Senior Transeastern Lender Banks v. Off. Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012), which is particularly instructive because there, like here, a contract obligated the proceeds to be paid to entities that were not the direct transferees.  In *TOUSA*, the transfer at issue involved a lien that was transferred to lenders in order to secure a loan.  The court held that the recipients of the loan's *proceeds* were the entities for

16

whose benefit the transfer of the *lien* was made because the loan agreements had "required that the proceeds of the loans secured by the liens be transferred to [the recipients]." *Id.* at 1313-14. So too here: ADS's lenders benefited when the transfers were made, since, as discussed further in Section II *infra*, the Trustee does not dispute that ADS was contractually obligated to, and did, immediately use the $750 million in Spinoff proceeds that it received to pay down its own credit agreement.

    **B.    The *Greektown* standard faithfully applies the Supreme Court's guidance in *Merit Management*.**

In *Merit Management*, the trustee sought to avoid "a transfer from A → D that was executed via B and C as intermediaries"; the Supreme Court held that the fact that B and C were covered entities did not by itself warrant application of the Section 546(e) safe harbor. 583 U.S. at 369. Instead, "the relevant transfer for purposes of the § 546(e) safe harbor is the same transfer that the trustee seeks to avoid," *i.e.*, A → D. *Id.* at 386. *Nevertheless*, the Supreme Court went on to emphasize, in order to "give[] full effect to the text of § 546(e)[,]" "the safe harbor . . . bar[s] avoidance if the transfer was made '*for the benefit of*' [a covered entity], *even if it was not made 'by' or 'to' that entity.*" *Id.* at 384 (emphases added). In other words, the safe harbor applies not only if A or D were themselves covered entities, but also if the A → D transfer was "for the benefit of" another covered entity.

*Greeektown* was argued and decided in reaction to the Supreme Court's *Merit Management* decision. Originally, the Eastern District of Michigan Bankruptcy

Court granted the defendant's motion to dismiss based on the then-controlling Sixth Circuit precedent, *In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009). *See Greektown*, 621 B.R. at 802. The District Court affirmed dismissal. *Id.* However, when the *Greektown* ruling was on appeal to the Sixth Circuit, *Merit Management* was decided; accordingly, the Sixth Circuit remanded the case back to the Bankruptcy Court "for reconsideration in accordance with the Supreme Court's recent decision in *Merit Management*." *Id.* at 802 n.2.

On remand, the defendants argued that the transfers in the disputed transaction were made "for the benefit of" Merrill Lynch, which had acted as an "integral participant with many roles in the overall transfer" and stood to receive "several millions of dollars in fees and expenses." *Id.* at 821. The *Greektown* decision rejected that argument and instead accepted the stringent standard proposed by the trustee plaintiff, holding that the challenged transfers were not for Merrill Lynch's benefit because "the fees associated with its services do not correspond in value to the [challenged] transfers to the Defendants." *Id.* at 823. *Greektown* thus established the *plaintiff-friendly* standard for satisfying the "for the benefit of" prong to apply only in situations where, as here, the value of the benefit conferred upon the covered entity corresponds directly to the value of the transfers for which avoidance is sought.

18

C.  The *Greektown* standard strikes an appropriate balance between competing legislative objectives.

The *Greektown* standard also strikes the appropriate balance between competing legislative objectives of plaintiff's constructive voidable transfer rights and a meaningful securities safe harbor. Indeed, the purpose of Section 546(e) "was to promote finality and certainty for investors, by limiting the circumstances . . . under which securities transactions could be unwound. The broad language used in Section 546(e) protects transactions rather than firms, reflecting a purpose of enhancing the efficiency of securities markets in order to reduce the cost of capital to the American economy." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 92 (2d Cir. 2019) (citation modified). Against this background, *Merit Management* illustrates the importance of the "for the benefit of" language given that the plaintiff has the right to specify the transfer it seeks to challenge in a complex multipart transaction. Where funds were transferred A → B → C → D, and where B and C were covered entities, a plaintiff could successfully navigate its claim around the safe harbor by challenging only A → D (instead of challenging A → B, B → C, C → D, or A → C, all of which would have been shielded). But *Merit Management* recognized that Section 546(e) still left an outer bound on the plaintiff's ability to artfully shape the challenged transfer, and preserves the purpose of the securities safe harbor, where that transfer is "for the benefit of" a covered entity.

19

*Greektown* also adopted a plaintiff-proposed standard that keeps the "for the benefit of" prong of Section 546(e) from sweeping too broadly. It is not enough that a covered entity receives some benefit from the challenged transfer—so a covered entity receiving fees or other tangential benefits, as in *Greektown*, would not qualify. But that component of Section 546(e) does apply when the covered entity gets a direct benefit that matches the amount of the transfer the plaintiff seeks to challenge. This case is an even stronger one, where the Lender Banks were contractually entitled to the full, dollar-for-dollar, amount of the transfers the trustee challenged.

**D.      The Bankruptcy Court's reasons for rejecting *Greektown* are not compelling.**

The Bankruptcy Court rejected the *Greektown* standard in a lone footnote—but it did so based on an apparent misunderstanding of *Greektown*'s holding and Defendants' argument. Specifically, the Bankruptcy Court wrote that it "reject[ed] Defendants' efforts to use the expansive definition used in [*Greektown*] to include Defendants as transferees. Defendants appear to seek treatment as initial transferees, and they may be after a trial. But they also may be subsequent transferees for purposes of a recovery under § 550." (APPEAL_000880 n.63.) This footnote relied on two incorrect premises. *Greektown* specifically analyzed an entity (Merrill Lynch) that was *not* a transferee. 621 B.R. at 821-22. And Defendants never argued that they, or the Lender Banks, were the initial transferees of the challenged transfer, but instead specifically argued that the transfers were "'for the benefit of' an entity

20

that *was not the defendant transferee*"—*i.e.*, the Lender Banks.  (APPEAL_000482 (emphasis added).)  The Order furthermore did not explain the legal significance of characterizing Defendants as initial transferees or subsequent transferees where the relevant safe harbor focuses only on whether the transfers were made "for the benefit of" other entities altogether.

The Order also never offered an alternative interpretation of "for the benefit of" in Section 546(e), nullifying that statutory language and leaving Defendants in the dark as to how they could ever prove the transfers were safe-harbored under an unknown standard.  For its part, the Trustee, in its opposition to the motion for leave to appeal, attempted to supply the missing reasoning in the Order by proposing an unsupported *intent* standard—one that it had actually rejected in its opposition to the motion for partial summary judgment.  (*Compare* Appellee's Opp. Mot. Leave Appeal, Dkt. 2 ("MLA Opp.") ¶ 35 (arguing that "the SDA's terms (and the related Contribution and Distribution Agreements) *did not evidence an intent to benefit* the Lenders" (emphasis in original)) *with* APPEAL_001848-49 (Trustee arguing that "[t]here is no suggestion in *Merit Management* that the motivations of the parties . . . make any difference . . . in determining the applicability of Section 546(e)").)  The Trustee cites no authority supporting a nebulous intent standard, and *Greektown* remains the only reasoned authority to address the meaning of "for the benefit of" in Section 546(e).  Therefore, the *Greektown* standard should apply here.

21

## II.    The Bankruptcy Court Erred in Finding an Issue of Fact Where the Trustee Failed to Rebut with Probative Evidence

If the *Greektown* standard applies, then the transfers qualify for the safe harbor, since the parties do not dispute the following facts:

1.    The relevant transfers are those between (i) LVI and ADILC and (ii) Rhombus and ADS Crown Helix Limited.  (*See* APPEAL_000863.)

2.    These transfers were made "in connection with a securities contract."  (*See* APPEAL_000856.)[7]

3.    ADILC and ADS Crown Helix Limited were contractually required to distribute the proceeds from the challenged transfers to ADS.  (*See* APPEAL_001069; APPEAL_001828-30.)

4.    ADS was contractually required to pay those same proceeds to the Lender Banks.  (*See* Dkt. 2 (MLA Opp.) ¶ 35.)

5.    ADS did, in fact, pay those proceeds to the Lender Banks. (APPEAL_000486-88.)

6.    The Lender Banks were covered entities.  (APPEAL_000488-90.)

Because these facts are undisputed, the Bankruptcy Court erred in holding that there existed an issue of material fact that foreclosed summary judgment.

The Bankruptcy Court below denied summary judgment on the basis that:

> [T]here is a genuine issue of material fact over whether the SDA mandated payment to non-contract parties like Wells Fargo and the Term Loan Lenders.  There is also a dispute over whether Wells Fargo and the Term Loan Lenders must be the third-parties or ADS Eligible Creditors

---

[7] In addition, Section 546(e) also safe-harbors transfers that are "settlement payments."  The parties do not dispute that the transfers were made in connection with a securities contract or, in the alternative, were qualifying settlement payments. (APPEAL_001835.)

referenced in the Restructuring Plan.  Defendants claim the ADS Credit Agreement required ADS to pay Spinoff proceeds to Wells Fargo and the ADS Term Loan Lenders.  This only highlights that there are disputed material facts between the parties.  Summary judgment is denied for these reasons alone.

(APPEAL_000879.)  This denial was error as a matter of law, because the "genuine issue of material fact" that formed the basis for its decision—i.e., whether the SDA (and Restructuring Plan incorporated therein) mandated payment to Wells Fargo and the Lender Banks, or to other unknown lenders—is *not* disputed, as discussed further below.

To support their motion for summary judgment, Defendants provided evidence that the Lender Banks received a direct, ascertainable, and quantifiable benefit corresponding in value to the challenged transfers.  In particular, Defendants submitted wire records showing that ADS paid Wells Fargo, in its capacity as the ADS Credit Agreement administrative agent, $750 million on November 8, 2021, and on the same day, Wells Fargo transferred $750 million to the Lender Banks. (APPEAL_000486-88 (citing APPEAL_000497-555).)  In other words, when the Spinoff was in fact consummated and the transfers made, ADS paid its lenders exactly $750 million—that is, every dollar of the Spinoff proceeds that ADS received.  Defendants also explained that ADS was obligated to do so through both the SDA and the ADS Credit Agreement.  In particular, the SDA required that ADS "us[e] the Cash Proceeds [i.e., the $650 million] ***to repay or repurchase certain of***

23

*its debt from third-party lenders*," and "use cash proceeds it receives in Step 5 of the Restructuring Plan [i.e., the $100 million] *to repay or repurchase certain of its debt from third-party lenders*."    (APPEAL_000484 (quoting APPEAL_001202 (emphases added).))    Defendants also explained that the ADS Credit Agreement required the Spinoff proceeds be paid to ADS's lenders.[8]

Following this submission, it was the Trustee's burden to "rebut with significant probative evidence."    *In re Porter Dev. Partners, LLC*, 2024 WL 1549689, at *3 (Bankr. S.D. Tex. Apr. 9, 2024) (internal quotation marks omitted). The Trustee did not do so.  It did not dispute that the $750 million in fact went to Wells Fargo and then to the Lender Banks on the same day.  It did not dispute that the ADS Credit Agreement required ADS to transfer all of the Spinoff proceeds to the Lender Banks.  The Trustee has also now conceded that there was, and is, no dispute over whether the "third-party lenders" in the SDA meant the Lender Banks: in its February 19, 2026 filing in this Court, the Trustee wrote, "Defendants claim that 'the [Trustee] argued that there was a question of material fact as to the identity of the 'third-party lenders' in the Separation and Distribution Agreement.'  Not so. Rather, [the Trustee] argued that the SDA's terms (and the related Contribution and

---

[8]  Defendants respectfully refer the Court to their Motion at pages 7-9 (APPEAL_000484-86) for a fuller discussion of the contractual analysis of the SDA and ADS Credit Agreement.

Distribution Agreements) *did not evidence an intent to benefit* the Lenders." (Dkt. 2 (MLA Opp.) ¶ 35 (emphasis in original).)

Therefore, the Bankruptcy Court's denial of summary judgment on the basis of "a genuine issue of material fact over whether the SDA mandated payment to non-contract parties like Wells Fargo and the Term Loan Lenders" and "whether Wells Fargo and the Term Loan Lenders must be the third-parties or ADS Eligible Creditors referenced in the Restructuring Plan" was error. "Factual controversies are resolved in favor of the nonmovant 'only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts.'" *Southstar Holdings*, 654 B.R. at 252 (quoting *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996)). And here, in addition to not disputing that the ADS Credit Agreement required the $750 million to go to the Lender Banks, or that the $750 million did go to the Lender Banks, the Trustee also provided *no* rebuttal evidence on whether the SDA (and Restructuring Plan incorporated therein) plausibly meant any other third-party lenders and has now conceded that there is no dispute as to that fact. The Bankruptcy Court's decision should therefore be reversed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court reverse and grant Defendants partial summary judgment on the twenty claims that

25

are subject to Section 546(e) or, in the alternative, that this Court reverse and remand

for further proceedings.

Dated:  April 1, 2026


Respectfully submitted,


**DAVIS POLK & WARDWELL LLP**     **PORTER HEDGES LLP**

                                  /s/ Eric D. Wade

Benjamin S. Kaminetzky (admitted *pro*     Eric D. Wade
*hac vice*)                                Tex. Bar No. 00794802
James I. McClammy (admitted *pro hac*     John F. Higgins
*vice*)                                    Tex. Bar No. 09597500
Joshua Y. Sturm (admitted *pro hac*       Megan Young-John
*vice*)                                    Tex. Bar No. 24088700
Tina Hwa Joe (admitted *pro hac vice*)    James A. Keefe
450 Lexington Ave                          Tex. Bar No. 24122842
New York, NY 10017                         1000 Main Street, Suite 3600
Tel: 212-450-4000                          Houston, TX 77002-6336
ben.kaminetzky@davispolk.com               Tel: 713-226-6648
james.mcclammy@davispolk.com               ewade@porterhedges.com
joshua.sturm@davispolk.com                 jhiggins@porterhedges.com
tina.joe@davispolk.com                     myoung-john@porterhedges.com
                                           jkeefe@porterhedges.com

*Counsel for Defendants-Appellants Bread Financial Holdings, Inc. f/k/a Alliance
Data Systems Corporation, in its own name and as successor-in-interest to
Alliance Data Foreign Holdings LLC, and ADS Foreign Holdings, LLC; and
Joseph L. Motes III*

27

## Certificate of Service

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was duly served on all parties in interest via electronic mail and the Court's electronic filing system on April 1, 2026.

/s/ *Eric D. Wade*
Eric D. Wade

## Certificate of Word Count

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned hereby certifies that this document complies with the type-volume limit of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), this document contains 5,897 words.

This document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font.

/s/ *Eric D. Wade*
Eric D. Wade

28